ST. PAUL, J.
In 1887 Dill, the deceased, married Caroline Rogers, Widow Gerard, in the state of New York; whence the couple removed to Texas. Thereafter the husband removed alone to Louisiana, where he established a domicile and acquired an estate composed of movable (personal) property, valued about $60,000 net. It does not appear when the husband first came to Louisiana, nor why the wife did not accompany him. But in 1902 the wife was committed to an insane asylum in New York, and in 1904 her daughter, Mabel Gerard, wife of Livingston, was duly and legally appointed her guardian (curatrix).
Just prior to his death in 1922, the deceased executed a will whereby he instituted as his sole heir his sister Julia Dill, Widow Patton, as he had a right to do, having no forced heirs.
The sister, as sole heir, being about to take possession of the entire effects composing the estate of the deceased, the guardian of his widow has filed a claim for one-half of the estate as belonging to her ward by virtue of the community laws of this state. Which claim is opposed by the sister, on tfie ground that as the parties were not married in this state, have never (both) removed to this state, and did not (both) reside out of the state, there was no community of acquets and gains between them. In other words, the contention of the sister, as sole heir, is that although such a community exists (1) when the parties marry in this state; (2) when the parties though married out of the state have (both) removed to this state; and (3) when the parties have married out of the state and continue (both) to reside out of the state; yet when the parties have married out of the state and one of them only has remov *50 ed to this state whilst the other continues to reside out of it, then there is no community of acquits and gains between them.
The learned and able trial judge thought this contention well founded, and accordingly he maintained an exception of no cause of action and dismissed the demands advanced on behalf of the widow.
But we think differently, and the judgment must therefore be reversed.
I.
Under the Spanish dominion the community of acquets and gains in Louisiana was regulated by the provisions of the Fuero Beal, being the promulgation by royal authority of the ancient customs of the kingdom of Castile (A. D. 1255).
Those provisions were:
“Everything .which the husband and wife may acquire while together, shall be equally divided between them.” Novisima Recopilacion, book 10, tit. 4, law 1.
When the old Civil Code was adopted in 1808, its provisions were:
“Every marriage contracted in this state, superinduces of right, partnership or community of acquSts or gains, if there be no stipulation to the contrary.” Page 336, art. 63, now article 2399, R. C. C. of 1870.
When the new Civil Code was adopted in 1825, there was added:
“A marriage contracted out of this state, between persons who afterwards come here to live, is also subjected to community of acquits, with respect to such property as is acquired after their arrival.” Article 2370, now article 2401, R. C. C. of 1870.
In Saul v. His Creditors, 5 Mart. (N. S.) 569, 16 Am. Dec. 212, it was held that the addition in the Code of 1825 was already the law of this state, by reason of the provisions of .the Fuero Beal first above quoted, which had not been repealed.
In Cole’s Widow v. His Executors, 7 Mart. (N. S.) 41, 18 Am. Dec. 241, and again in Dixon v. Dixon’s Executors, 4 La. 188, 23 Am. Dec. 478, it was held that under the provisions of the Fuero Beal, above quoted, property acquired in this state by one of the married persons, who removed thereto alone, became community property, although the other spouse had never come into the state.
But in the last-ilamed case the court said that the above-quoted provisions of the new Code changed the previous regulations, and provided only for a case where both parties came into the state; that it did not supply the place of the Spanish law (Fuero Beal) which had been repealed by the Act of 1828, No. 83; and that it left in silence the rights growing out of the removal of one of them here.
In Cooper v. Cotton, 6 La. Ann. 256, and in Succession of McGill, 6 La. Ann. 327, where the parties had married out of the state, and remained domiciled out of the state, it was held that there was no community as to property acquired,in this state. And in Huff v. Borland, 6 La. Ann. 436, it was held that there was no community as to property acquired “before the arrival of either husband or wife for the purpose of residence in this state.” See, also, Heirs of Dohan v. Murdock, 41 La. Ann. 494, 6 South. 131.
These three cases were decided in 1851. But the Legislature met the following year, and passed a statute (No. 292 of 1852, p. 200) which has become article 2400 of the Bevised Civil Code of 1870, reading as follows:
“All property (hereafter) acquired in this state by nonresident married persons, whether the title thereto be in the name of either the husband or wife, or in their joint names, shall be subject to the same provisions of law which regulates the community of acquéts and gains between citizens of this state.” Approved March 18, 1852.
II.
In Succession of Franklin, 7 La. Ann. 395 (decided in 1852, but arising out of facts ae *52 cruing before that year), there was no question whatever of a separate domicile for husband and wife.
The justices all delivered separate opinions. Mr. Justice Rost found that, “Franklin’s domicile having continued in Tennessee, it necessarily followed that he and the plaintiff never came here to live.” Mr. Justice Slidell found that “the true, fixed, and permanent home of the husband and wife was in Tennessee, and that Louisiana was, both to himself and his wife, a temporary resort for the purpose of business and pleasure.” Mr. Chief Justice Eustis “concurred in opinion with Justices Rost and Slidell” concerning the place where Franklin had his domicile. Mr. Justice Preston (dissenting) found that “Franklin was a citizen of Louisiana when he married, and that Louisiana was his place of residence when he died, and, therefore, that a community of acquets existed between him and his wife from their marriage until it was dissolved by death.” The parties were married in Nashville, Tenn.
The widow had claimed that “at the time of her marriage with Franklin, in the state of Tennessee, he was domiciled in this state, and that, the. matrimonial domicile having been in Louisiana until the dissolution of the marriage, the distribution of the real estate acquired here during its continuance, and of the personal estate wherever situated, should be according to the laws of Louisiana.” That is she claimed the existence of a community.
Considering, therefore, that there was no question of separate domiciles, that as shown by the evidence, summarized by Mr. Justice Rost, Franklin’s “family” resided with him as well when he was in Louisiana as when in Tennessee, that the sole question involved was where was Franklin’s domicile to the end of establishing the matrimonial domicile ; therefore the following expressions of Mr. Justice Rost, relied upon by appellee, must be considered either obiter dicta, or, as is more likely, that he meant that the widow must show that Franklin both intended to, and did maintain his chief domestic establishment in Louisiana; the expression of the learned justice being as follows:
“To establish the position assumed, the plaintiff must show that after her marriage her husband and herself came here to live. She must make all the proof necessary to establish the domicile of Franklin in Louisiana; and further ,that they both came to that domicile to live, and that they did live there until the marriage was dissolved by the death of Franklin.”
If the learned justice meant anything else, even obiter, then it is difficult to understand how, just two months before he should have written the opinion in Hubbell v. Inkstein, 7 La. Ann. 252 (concurred in by all).
In that case Mary Inkstein had married Julius Hubbell in 1826, believing he was a single man. She was found to have been in good faith and entitled to one-half his property as putative wife.
Sarah Hubbell, his first wife, claimed her share. The court said:
“Julius Hubbell came here from New York in 1820, and remained till his death in 1837. Pie was an inhabitant of the state; and the property acquired by him during his residence was subject to our laws, and must be held to have been community property between Ms first wife and himself. The marital cohabitation did not fail through her fault, and she is not to lose her rights on account of the fault and misconduct of her husband.” (Italics ours.)
It is true that in the statement of the case it does not appear distinctly that the first wife had not come to Louisiana with her husband; but since it was quite clear that, had she come with him, there would have been a community regardless of any abandonment of her after their arrival, it must be that the last sentence above quoted referred to an abandonment of her in New York. And this conclusion is strengthened by the fact that she put forward her claim only 15 years aft *54 er his death, although he had not changed his name, and the putative wife had publicly possessed both his estate and name during all of that time. Hubbell v. Hubbell, 5 La. Ann. 524.
III.
We therefore find in the foregoing cases only two which bear directly on the issue under consideration in this case. Dixon v. Dixon’s Executors, 4 La. 188, 23 Am. Dec. 478, may be taken as authority for the claim that no community exists when only one of the married persons comes to live in the state, and Hubbell v. Inkstein as authority to the contrary.
We find, however, that in 1851 it was three times held that there was no community where neither party removes into the state, to wit, Cooper v. Cotton, 6 La. Ann, 256; Succession of McGill, 6 La. Ann. 327; and Huff v. Borland, 6 La. Ann. 436.
But this was followed immediately by an act of the Legislature (1852) declaring that the property acquired in this state by nonresident married persons should be subject to the same provisions of law which regulate the community between citizens of this state.
Now it will be observed that the addition in the Code of 1825 (article 2370) provided for a community between persons married outside the state, only .from the time they removed into the state. But the act of 1852 provided that all property acquired in this state by nonresident married persons shall be subject to the same provisions of law which regulate the community between citizens of this state.
So that even if we hang on the bare words of the statute, without seeking the broader intent of the Legislature, we find that any property which the wife (now widow) of this deceased might have acquired in this state at any time after her marriage would have become community property; i. e., subject to the -same provisions of law which regulate the community between citizens of this state. Eor such property would certainly have come within the very letter of the law, be that law construed never so narrowly; since she was certainly a nonresident married person. To this we see no possible answer, unless we put such a strained construction on the words of Code of 1825, as to make it read that property acquired in this state by a nonresident married person, shall be community property unless the other spouse be a resident of this state. And we look to the Code in vain for any such exception.
But the community between married persons is said by the Code to be a partnership, not of course in the ordinary sense of that word, but still a “partnership.”
And we cannot conceive that the Legislature could possibly intend that in such a partnership the property of the nonresident spouse should be common property, whilst that of the resident spouse should remain the seprrate property of that spouse. Such a condition (beside its manifest injustice, which is not to be-presumed) would¡not even fit the words of the statute, for such a community would not be “subject to the same laws” which regulate the community be’tween citizens of this state. ■ If the property acquired by the nonresident spouse falls into the community, the property acquired by the resident spouse must also fall into the community.
It will be observed that when Judge Porter, in Dixon v. Dixon’s Executors, 4 La. 188, 23 Am. Dec. 478, said that the law left in silence the rights growing out of the removal of only one of the spouses into this state he was speaking of the provisions of the Code of 1825, which provided only for property acquired after the married persons had removed to this state. The act of 1852 had not yet been passed, which provides that all the property acquired in this state by *56 nonresident married persons shall be subject to the community laws of the state.
But that construction cannot be put on the act of 1852. For that act clearly superseded the provisions of the Code of 1825. That Code provided for a community between nonresident married persons only from the time they removed into the state, whilst the act of 1852 provided for a community from the moment of marriage; so that the case provided for by the Code of 1825 was fully,covered by the act of 1852, and thus the provisions of said Code became mere surplusage.
For it is manifest that the act of 1852, even if it stood alone, could not possibly mean that there should be a community between nonresident married persons as long as they continue to reside out of the state, but that such community should cease upon their removal into this state; since such a community would not be subject to the same provisions of law which regulate the community “between citizens of this state.”
IV.
But the statute of 1852, following, as it did, the three decisions in the Fifth Annual, was evidently intended to provide broadly for putting on the same footing all property acquired in this state by married persons, whether residing in or out of the state. The language is that—
“All property acquired in this state by nonresident married persons * * * shall be subject to the same provisions of law which regulate the community of aequéts and gains between citizens of this state.”
And such has always been the accepted meaning of that statute, never even so much as questioned by either bench or bar, from the time the statute was passed until the present day. Abston v. Abston, 15 La. Ann. 137; Succession of Navarro, 24 La. Ann. 298; Jermann v. Tenneas, 39 La. Ann. 1021, 3 South. 229; Waterhouse v. Star Land Co., 139 La. 177, 71 South. 358.
V.
We agree with the proposition, that a community between married persons is exclusively the creature of positive law (Heirs of Dohan v. Murdock, 41 La. Ann. 494, 6 South. 131). But we think the law, however it be written, should be so construed as to carry out the legislative intent; that a law ought not to be so construed as to “convict the legislator of carelessness and Inadvertence.” if any other construction be possible (Succession of Baker, 129 La. 74, 84, 55 South. 714, Ann. Cas. 1912D, 1181).
Now it is clear that a community exists in the following cases:
(1) Where the parties marry, and continue to live here.
(2) Where the parties marry here, and remove out of the state.
(3) Where the parties marry outside the state, and continue to reside outside thereof.
(4) Where the parties marry outside the state, and then remove here together.
And all these communities have, as their basis, equality between the spouses; that is to say, property acquired in this state by either of them falls into the community.
It is also equally clear (as we think) that there is some sort of a community between persons married out of the state, when one of them comes to this state And the other remains away; for the one who remains away is certainly a nonresident married person. C. C. art. 2400.
But since we cannot hold, in the teeth of the law, that property acquired in this state by that one of the married persons who continues to reside out of the state, does not become the common property of both spouses, it follows that, to allow the contention of the appellee, and hold that property acquired by that one of the spouses who came here alone does not become common property, would be to convict the legislator not only of carelessness and inadvertence, but of mani *58 fest injustice, and of belying his own words when he says that property acquired in this state by nonresident married persons is to be subject to tbe same provisions of law which regulate tbe community between citizens of tbis state.
VI.
We therefore conclude that the accepted interpretation of the act of 1852 (R. C. C. art. 2400) is the correct interpretation thereof, and that all property acquired in this state by married persons becomes community property regardless of where both or either of them reside (unless they have contracted otherwise). R. C. C. art. 2329; Act 236 of 1910, p. 400.
Decree.
Tbe judgment appealed from is therefore reversed; and it is now ordered that the' exception of no cause of action! herein filed by tbe appellee be overruled, and that tbis case be now remanded to tbe court a qua for further proceedings according to law.
Rehearing denied by tbe WHOLE COURT.